**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| LISA CABONILAS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>VERADIGM INC. and VERADIGM LLC,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Lisa Cabonilas ("Cabonilas" or "Plaintiff"), individually and on behalf of all others similarly situated ("Class Members"), brings this Class Action Complaint against Veradigm Inc. and Veradigm LLC (collectively "Veradigm" or "Defendants") and alleges, upon personal knowledge as to her own experience and upon information and belief and her counsel's investigation as to all other matters, as follows:

## I.      PRELIMINARY STATEMENT

1.      Plaintiff brings this class action against Veradigm for its failure to secure and safeguard the personally identifiable information ("Personally Identifiable Information" or "PII") and protected health information ("Protected Health Information" or "PHI") of over 70,000 people, including highly sensitive personal information.

2.      The PII includes names, dates of birth, contact details, payment details, and personal identifiers like driver's license numbers and Social Security numbers.  The PHI at issue includes the PII together with health records data (such as diagnoses, medications, test results, and treatment records) and personal health insurance information.  Together, the PII and PHI are referred to herein as "Sensitive Information."

1

3.      Veradigm is a health information technology company.  It describes itself as providing "software solutions to healthcare providers and practices."

4.      Veradigm regularly acts as a business associate to covered entities, like healthcare providers and practices, that are regulated by the Health Insurance Portability and Accountability Act of 1996 and its implementing regulations ("HIPAA").  This means the information Veradigm collects and/or maintains is also subject to HIPAA and that Veradigm acts as a Business Associate under HIPAA.

5.      On its computer network, Veradigm holds and stores certain highly Sensitive Information of the Plaintiff and the putative Class Members.[1]  Plaintiff and Class Members are patients of healthcare providers and practices that contract with Veradigm.

6.      Veradigm voluntarily assumed and continues to assume a duty to comply with data privacy laws related to Class Members' Sensitive Information.

7.      For instance, Veradigm repeatedly touts its focus on privacy and data collection. Veradigm, on its own website, tells its customers that its services allow healthcare providers and professionals to "simplify compliance."  Regulatory privacy requirements include, but are not limited to, compliance with statutes like HIPAA, 42 U.S.C. § 1320(d), *et seq.* and 45 C.F.R. Parts 160, *et seq.*, and the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, *et seq.*

8.      On the Privacy and Security Program page of its website, Veradigm also states that it "take[s] information privacy and data protection very seriously.  Veradigm is committed to protecting and promoting the privacy of sensitive information with which [it has] been entrusted."

9.      The Privacy and Security Program page also includes Veradigm's self-proclaimed privacy vision, which is "[t]o protect the privacy of corporate, employee, client and other

---

[1] "Class" is defined in Section VI, Class Action Allegations, *infra*.

confidential information; ensure the proper use and disclosure of such information; and, foster a culture that values privacy through promoting privacy awareness, and providing meaningful advice and guidance on privacy ideals and expectations."

10. Despite these assurances, on approximately December 15, 2024, a data breach occurred (the "Data Breach").

11. Veradigm claims that it determined that the Data Breach had occurred on July 1, 2025.

12. Veradigm reports that the Data Breach involved an unauthorized party using a credential from one of its customers to access data maintained in Veradigm's storage account.

13. Veradigm's own security protocols did not catch the intrusion; rather, Veradigm only became aware of the Data Breach through a third party investigating a data security incident of one of its customers.

14. Instead of promptly notifying Plaintiff and Class Members so that they could take immediate action to mitigate the risks associated with the disclosure of their information, Veradigm unreasonably delayed notifying them.

15. Veradigm did not even begin notifying Class Members until September 22, 2025.

16. Plaintiff did not receive notice until October 3, 2025.

17. Plaintiff and Class Members were completely unaware of the Data Breach until they received Veradigm's letters informing them of it.

18. Veradigm's delay was made all the more unreasonable given the proprietary and highly sensitive nature involved in the Data Breach.

19. Veradigm acquired the Sensitive Information of Plaintiff and Class Members through its clients, healthcare providers and practices. Veradigm then used and stored this Sensitive Information, which includes PII and PHI.

20. HIPAA sets minimum national standards to protect health information, including the PII and PHI involved in this Data Breach.

21. PII and PHI are intangible property—an asset that can be bought and sold.[2] The highly sensitive nature of the PII and PHI involved in this case means the Sensitive Information exposed in the Data Breach is very valuable.[3]

22. People, including Plaintiff and Class Members, highly value their personal information and keeping it private, especially because of the negative repercussions of identity theft when it is exposed. These repercussions include "significant negative financial impact on victims," "severe[] distress[] over the misuse or attempted misuse" of personal information, and "strong emotions and feelings as a result of their victimization."[4]

23. Here, the accessed information contained the most highly sensitive categories of protected information. The data included Class Members' Social Security numbers, which are arguably "the most dangerous type of personal information in the hands of identity thieves." *McFarlane v. Altice USA, Inc.*, 524 F. Supp. 3d 264, 272 (S.D.N.Y. 2021). A Social Security number is immutable and can be used to 'impersonat[e] [the victim] to get medical services,

---

[2] Marc Smith, *Unlocking the Hidden Value of Data as an Asset*, TEKSYSTEM (Dec. 20, 2023), https://www.teksystems.com/en/insights/article/data-as-an-asset (*last accessed*, Oct. 7, 2025).

[3] *See, e.g.,* John T. Soma, et al., *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.").

[4] *Identity Theft Resource Center, Identity Theft: The Aftermath 2017*, https://www.idtheftcenter.org/wp-content/uploads/images/page-docs/Aftermath_2017.pdf (*last accessed*, Oct. 7, 2025).

government benefits, . . . tax refunds, [and] employment.'" *McFarlane*, 524 F. Supp. 3d at 272-273 (collecting cases explaining that Social Security numbers present a unique vulnerability in data breaches because of their permanence, making them the "gold standard for identity theft").

24.     To date, Veradigm has not identified the full extent of information disclosed through the Data Breach.

25.     The Data Breach was a direct result of Veradigm's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect Plaintiff's and Class Members' Sensitive Information.

26.     First, Veradigm maintained Sensitive Information in a reckless manner.   In particular, the Sensitive Information was maintained on Defendants' computer network in a condition vulnerable to cyberattacks and unauthorized access.   The potential for improper disclosure of Plaintiff's and Class Members' Sensitive Information was a known risk to Veradigm.   Thus, Defendants were on notice that failure to take steps necessary to secure the Sensitive Information from those risks left the Sensitive Information in a dangerous condition.

27.     Second, Veradigm disregarded the privacy and property rights of Plaintiff and Class Members by, among other things, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard the Sensitive Information of Plaintiff and Class Members; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff and Class Members prompt and complete notice of the Data Breach as required by, *inter alia*, federal laws, including HIPAA.

28.     Third, Veradigm and its employees failed to properly monitor the computer network and systems that housed the Sensitive Information.  Had Veradigm properly monitored its computers, it would have discovered the intrusion sooner and potentially been able to mitigate the injuries to Plaintiff and Class Members.

29.     If Veradigm's customers had known of Veradigm's lax security practices with respect to their Sensitive Information, they would not have used Veradigm for their healthcare services given the risks posed by Veradigm's lax security practices and, as a result, the customers' patients—including Plaintiff and Class Members—would not have had their Sensitive Information exposed.

30.     Plaintiff's and Class Members' identities are at substantial and imminent risk of fraud and identity theft because of Defendants' negligent and otherwise illegal conduct.  This is because the Sensitive Information that Defendants collected and maintained (including Social Security numbers and dates of birth) is now in the hands of unauthorized parties.

31.     Armed with the Sensitive Information accessed in the Data Breach, data thieves can commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, filing false medical claims using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

32.     As a result, Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

33.     As a further result, Plaintiff and Class Members have incurred or will incur out of pocket costs for, *e.g.*, purchasing credit monitoring services, purchasing credit reports, paying fees for obtaining new driver's licenses, and other protective measures to deter and detect identity theft.

34.     For these reasons, Plaintiff brings this class action lawsuit on behalf of herself and all individuals similarly situated to address: (i) Veradigm's inadequate safeguarding of Class Members' Sensitive Information that Veradigm collected and maintained, (ii) Veradigm's failure to provide timely and adequate notice to Plaintiff and other Class Members that unauthorized third parties had accessed their Sensitive Information, and (iii) for failing to disclose precisely what specific type of medical information, health insurance information, and Sensitive Information was accessed during the Data Breach.

35.     As such, Plaintiff brings claims for (i) negligence,[5] including negligence claims as evidenced by violations of HIPAA and the FTC Act and assumed duties, (ii) breach of implied contract (directly and as third-party beneficiary), (iii) breach of the implied covenant of good faith and fair dealing (third-party beneficiary), (iv) unjust enrichment, and other claims that may arise during the course of this litigation.

36.     Plaintiff seeks remedies including, but not limited to, monetary damages, nominal damages, reimbursement of out-of-pocket costs, injunctive relief (including improvements to Defendants' data security systems and security practices), and adequate long-term credit monitoring services funded by Defendants.

## II.     PARTIES

37.     Plaintiff Cabonilas is an adult, who at all relevant times, was a resident and citizen of the Commonwealth of Virginia.  Cabonilas did not receive a notice from Defendants informing

---

[5] As distinguished from negligence *per se*.

her that her Sensitive Information had been compromised during the Data Breach until October 3, 2025.

38.     Defendant Veradigm Inc. is a Delaware corporation with its principal place of business located at 222 Merchandise Mart, Chicago, Illinois 60654.

39.     Defendant Veradigm LLC is a North Carolina limited liability company.  It is wholly owned by Veradigm Inc., a Delaware corporation with its principal place of business located at 222 Merchandise Mart, Chicago, Illinois 60654.

## III.     JURISDICTION AND VENUE

40.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).  The amount in controversy exceeds $5 million, exclusive of interest and costs.[6]  The number of Class Members exceeds 100, many of whom have different citizenship from Defendants, including Class Members from Texas, South Carolina, and California.  Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

41.     The Court has general personal jurisdiction over Defendants because, personally or through its agents, Defendants operate, conduct, engage in, or carry on a business or business venture in this State.  Veradigm LLC's parent company is Veradigm Inc.  Veradigm, Inc. wholly owns Veradigm LLC.  Veradigm, Inc. maintains its headquarters at 222 Merchandise Mart, Chicago, Illinois 60654.  Defendants committed tortious and otherwise wrongful acts in Illinois.

---

[6] Credit monitoring can cost between $10-$30 per month per individual.  *See, e.g.*, https://compliancy-group.com/the-hidden-costs-of-a-data-breach/.  Although the full size of the Class is not yet known, at least 70,000 individuals have been confirmed as affected in two states alone (Texas and South Carolina).  California residents have also been impacted.  Additionally, here, the need for credit monitoring will continue throughout each Class Member's lifetime.  As such, the amount in controversy easily exceeds the jurisdictional amount.

42.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because Defendants are based in this District, and the acts and omissions giving rise to Plaintiff's and Class Members' claims occurred in and emanated from this District.

## IV.    GENERAL FACTUAL ALLEGATIONS

### A.    Background

43.    Veradigm, in the regular course of its business, collects and maintains the PII and PHI of patients as a part of its business practices as a healthcare information technology company that provides software to healthcare providers and practices.

44.    Veradigm's customers provide their patients' PII and PHI to Veradigm.  Veradigm's customers provide this information with the understanding that Veradigm will keep this highly personal Sensitive Information confidential; that Veradigm will comply with all privacy laws and regulations; and that Veradigm will properly safeguard such Sensitive Information from misuse and theft.

45.    In fact, Veradigm advertises its compliance with privacy laws on its own website. Its HIPAA Privacy Policy assures customers that Veradigm "provides reasonable and appropriate administrative, technical, and physical safeguards to protect the privacy, confidentiality, integrity and availability of [protected health information, or "PHI", under HIPAA]."

46.    Defendants are required to adhere to laws, rules, and regulations regarding Sensitive Information, including HIPAA.  Veradigm is aware of and publicly acknowledges and advertises its HIPAA and privacy obligations on its website and that it has a duty to comply with HIPAA.[7]

---

[7] *Privacy Notice*, VERADIGM, https://veradigm.com/legal/privacy-notice/ (*last accessed* Oct. 6, 2025).

47. Veradigm is aware of and had a duty to keep the Sensitive Information of Plaintiff and all Class Members confidential and to protect it from unauthorized access and disclosure.

**B.     Data Breaches Can Be Prevented**

48. Data breaches can be prevented through proper security measures. Veradigm could have prevented this Data Breach by properly encrypting and protecting equipment and computer files containing the Sensitive Information to protect them from unauthorized use of credentials.

49. The Federal Bureau of Investigation emphasizes that "[p]roactive [p]revention is the [b]est [d]efense" against ransomware.[8]

50. Veradigm should have implemented comprehensive cybersecurity measures including, but not limited to: (i) establishing training programs to educate its employees about these risks; (ii) deploying robust spam filters to block phishing emails from reaching users; (iii) implementing email authentication protocols such as Sender Policy Frameworks ("SPF") to prevent email spoofing; (iv) scanning emails to detect and filter threats; (v) setting up strategic firewall configurations to block malicious IP addresses; (vi) running automatic antivirus and anti-malware scans regularly; and (vii) using whitelisting to ensure only known and authorized programs were executed.

51. Microsoft, in its *Microsoft Digital Defense Report*, recommends additional security measures that companies should implement and, by extension, that Veradigm should have implemented. These include: (i) hardening internet-facing assets and identifying and securing perimeter systems; (ii) securing internet-facing remote desktop protocol services behind a multifactor authentication gateway; (iii) building credential hygiene; (iv) applying the principle of

---

[8] *How to Protect Your Networks from Ransomware*, FBI, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (*last accessed* Oct. 3, 2025).

least-privilege; (v) applying other "zero trust" principles; (vi) keeping systems up to date, and (vii) using multifactor authentication.[9]

52.     Given that Veradigm stored Sensitive Information, implementing these security measures was both necessary and feasible.  The occurrence of the Data Breach demonstrates the Defendants' failure to adequately implement one or more of these protective measures, resulting in the exposure of Plaintiff's and Class Members' Sensitive Information.

**C.     Veradigm's Data Was Breached**

53.     On or around December 15, 2024, an "unauthorized party used a credential obtained from one of [Veradigm's] customers."  Exhibit 1, Cabonilas Notice Letter.

54.     The attacker then used the credential it obtained from Veradigm's customer to access Veradigm's storage account, which contained Plaintiff's and Class Member's Sensitive Information.

55.     Veradigm reports that it first discovered the unauthorized access on July 1, 2025.

56.     Instead of promptly notifying Class Members of the unauthorized access, Veradigm chose to attempt to investigate internally, depriving Plaintiff and Class Members of the opportunity to implement prompt, precautionary mitigation measures.

57.     Although it reported the incident to law enforcement during its investigation, Veradigm did not notify Plaintiff or Class Members of the Data Breach at that time.

58.     Instead, Veradigm unreasonably delayed notifying Plaintiff and Class Members while it conducted its internal investigation described above.

---

[9]     *Microsoft Digital Defense Report: Building and improving cyber resilience*, https://www.microsoft.com/en-us/security/security-insider/threat-landscape/microsoft-digital-defense-report-2023 (*last accessed* Oct. 7, 2025).

59.     Veradigm then waited until September 22, 2025, *before it even started* notifying Plaintiff and Class Members about the Data Breach.

60.     Veradigm's notification was issued through form notice letters dated September 22, 2025 ("Notice Letters").  The Notice Letters were substantively inadequate and untimely.

61.     The Notice Letters only revealed that the Sensitive Information includes names, contact details, date of births, health records date (such as diagnoses, medications, test results, and treatments), health insurance information, and limited identifiers like Social Security numbers and driver's license numbers.

62.     The Notice Letters do not include any other information about the compromised data.  The Notice Letters do not articulate what contact details were exposed or articulate what health insurance information was breached, making them substantively inadequate.

63.     Although Veradigm claims it is implementing new data privacy safeguards and measures, the Notice Letters do not identify any of the measures it is taking.

64.     This lack of transparency forces Plaintiff and Class Members to speculate about the whereabouts of their Sensitive Information, the full extent of the information exposed, and the steps Defendants have actually taken, if any, to strengthen Veradigm's information security systems and monitoring capabilities to prevent future incidents.

65.     The Notice Letters were also untimely.  Veradigm knew about the Data Breach on July 1, 2025.  Yet, it waited 83 days before it even starting to send Notice Letters.

66.     This unreasonable delay exceeded the 60-day notification requirement of the HIPAA.

67.     Additionally, although Plaintiff's Notice Letter is dated September 22, 2025, she did not receive it until October 3, 2025.

68.     This 11-day gap suggests that, more likely than not, although Veradigm dated all Notice Letters September 22, 2025, it delayed printing and mailing all or some of them until after that date.

69.     Plaintiff and Class Members were wholly unaware of the Data Breach until they received the Notice Letters.

70.     Time is of the essence when trying to protect against identity theft after a data breach, so early notification is critical.

71.     Yet, due to Veradigm's delays, Plaintiff's and Class Members' PII and PHI was in the hands of unauthorized individuals, potentially including cybercriminals, for at least 83 days before Veradigm started to send Notice Letters to Plaintiff and Class Members.

72.     This means that Plaintiff and Class Members had to wait at least 83 days before they were made aware of the Data Breach or were otherwise alerted that they needed to take action to protect themselves.

73.     As a result of the Data Breach, Defendants now encourage Plaintiff and Class Members to take a range of protective measures, including (1) monitoring their accounts by obtaining their credits reports, (2) placing a security freeze on their credit files, (3) placing fraud alerts on their credit reports, and (4) activating credit monitoring. This is a tacit admission of the imminent risk of identity theft faced by Plaintiff and Class Members.

74.     Veradigm is also encouraging and offering credit monitoring and fraud assistance through its preferred vendor—but only for 12 months. This is a further acknowledgment that the impacted consumers are subject to a substantial and imminent threat of fraud and identity theft.

75.     Class Members' Sensitive Information was accessed in the Data Breach.  Plaintiff and Class Members reasonably believe their exposed Sensitive Information is currently available for sale on the Dark Web because that is the modus operandi of cybercriminals who target businesses that collect highly Sensitive Information by engaging in unauthorized access of data files.

76.     Defendants have obligations, including, but not limited to, voluntarily assumed duties, industry standards, statutes, and common law, to keep Plaintiff's and Class Members' Sensitive Information confidential and to protect it from unauthorized access and disclosure.

77.     Defendants could have prevented or mitigated this Data Breach by, among other things, better securing Veradigm's network, properly encrypting its data, or better selecting and supervising its information technology partners.  Defendants' negligence in safeguarding Plaintiff's and Class Members' PII and PHI was exacerbated by the known risk trends arising from data breaches and cyberattacks involving protecting and securing sensitive data, as evidenced by the trending data breach attacks in recent years.  For instance, in December 2023, *The Wall Street Journal* published "Cybersecurity in the Year Ahead:  Think 2023 on Steroids" forecasting rising cybersecurity threats in 2024.[10]  Indeed, in 2024 global cyberattacks rose 44%.[11]

---

[10]  Kim S. Nash, *Cybersecurity in the Year Ahead: Think 2023 on Steroids*, WALL ST. J., December 27, 2023, https://www.wsj.com/articles/cybersecurity-in-the-year-ahead-think-2023-on-steroids-ab711f4e?gaa _at=eafs&gaa_n=ASWzDAjgqsEwvHr1nUoUmotbruCLxDH57BgP083_8ZJVsm3gkSF5-CiBHtF4&gaa _ts=68e4148d&gaa_sig=ErYO1Rn3JK5ONYZI6nESev1FgOo4flPPE76If6wjvFEGJ86Diiz4DYOmpkF5 BMZ2JOUggGh1_HUMXBy8w0FB5w%3D%3D (*last accessed*, Oct. 6, 2025).

[11]   Colin Kellaher, *Aflac Says Personal Info May Have Been Stolen in* Cyberattack, WALL ST. J., June 20, 2025,   https://www.wsj.com/tech/cybersecurity/aflac-says-personal-info-may-have-been-stolen-in-cyberattack-7bde3fa9. (*last accessed*, Oct. 6, 2025).

**D.     PII and PHI Are Valuable Data, and the Data Breach Diminished their Value**

78.     The significance of a data breach and the value of the exposed personal information depends on the nature of the particular data exposed.  For instance, while credit card numbers can be changed, certain pieces of data—like Social Security numbers and dates of birth—are immutable.  Here, as discussed above, the most sensitive categories of data were exposed, including the "gold standard" in identity theft, Social Security numbers.

79.     According to one senior director at RedSeal, a network security risk analytics company, PII like the information involved in this Data Breach is worth more than 10x credit card information on the black market.[12]

80.     Experian reports that the average price for credit card details on the dark web is $10-$240.[13]

81.     Individuals' data also has value on reputable, clearnet marketplaces.  For instance, individuals can choose to sell their own data in exchange for cash, cryptocurrency, or discounts.[14]

## V.     PLAINTIFF-SPECIFIC FACTUAL ALLEGATIONS

*Plaintiff's Experience*

82.     Cabonilas greatly values her privacy and is very careful with her Sensitive Information.

83.     For instance, Cabonilas has a VPN that she routinely uses when accessing the internet to ensure that her online communications are secure.

---

[12]  Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, NETWORKWORLD (Feb. 6, 2015), https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (*last accessed*, Oct. 6, 2025).

[13]  Ben Luthi, *Here's What Your Data Sells for on the Dark Web*, EXPERIAN, June 30, 2025, https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (*last accessed*, Oct. 6, 2025).

[14]  DATA COUP, https://datacoup.com/ (*last accessed*, Oct. 6, 2025).

84. Cabonilas stores any physical documents containing Sensitive Information in a safe and secure location and destroys such documents when they are no longer needed, such as by shredding them.

85. Additionally, Cabonilas routinely uses multi-factor authentication to safeguard her Sensitive Information. For instance, she has three-factor authentication to ensure secure access to her bank accounts.

86. Cabonilas has never knowingly transmitted crucial PII, such as her Social Security number, over the internet or other unsecured networks.

87. Cabonilas diligently chooses unique usernames and passwords for her various online accounts, including complicated passwords and use of secure password managers to keep her data secure.

88. When Cabonilas does entrust a healthcare provider, including Virginia Ear, Nose & Throat Associates, with her Sensitive Information, it is only because she understands such information will be reasonably safeguarded from foreseeable threats, and that she will be timely notified if her data is exposed.

89. Here, Veradigm was a software provider to Virginia Ear, Nose & Throat Associates.

90. As part of its services, Veradigm entered a Business Associate Agreement ("BAA") with Virginia Ear, Nose & Throat Associates. Veradigm entered similar BAAs and with other healthcare providers and practices that treated other Class Members.

91. The contents of Veradigm's BAAs with Virginia Ear, Nose & Throat Associates and the healthcare providers are dictated by regulation, including HIPAA, and contractual requirements that benefit patients like Cabonilas and other similarly situated patients.

92.     On October 3, 2025, Cabonilas received a letter dated September 22, 2025, from Veradigm.  Exhibit 1 – Cabonilas Notice Letter.  The letter notified her of the Data Breach for the first time.  The letter advised that an unauthorized party had accessed Veradigm's storage account.  The letter further advised that Cabonilas' Sensitive Information—including her name, date of birth, contact details, health records, health insurance information, payment details, and identifiers like Social Security number or driver's license number—were identified as having been accessed by an unauthorized attacker.

93.     Recognizing the present, immediate, and substantially increased risk of harm Cabonilas faces, the letter offered Cabonilas a one-year subscription to credit monitoring and vague promises of "identity restoration support" if she is the victim of fraud.

94.     The letter further instructed Cabonilas to take an array of measures to protect her personal information.

95.     As a result of the Data Breach, Cabonilas has spent time researching the Data Breach, verifying the legitimacy of the Notice Letter, and contacting and coordinating with counsel, rushing to take action as soon as possible given that she was preparing to travel on the very day she received her notice letter.  Cabonilas will also spend more time dealing with the fallout of the Data Breach, including by having to request a new driver's license since hers was exposed in this breach.  This is valuable time Cabonilas would otherwise have spent or would spend on other activities, including but not limited to, work and/or recreation.

96.     Cabonilas and Class Members will incur out-of-pocket expenses for priority mail postage from mailing requests for their detailed credit reports and credit monitoring services.  Given Defendants' Data Breach, Cabonilas does not feel comfortable using Veradigm's free credit

monitoring service. At any rate, that service has only been offered for 12 months. Cabonilas knows that her need for credit monitoring will last longer than that.

97.     The Data Breach also caused Cabonilas to suffer a loss of privacy.

98.     As a result of the Data Breach, Cabonilas will face a substantial risk of imminent harm for the rest of her life.

99.     Cabonilas anticipates spending additional time and money on an ongoing basis to try to mitigate and address the present and impending injuries caused by the Data Breach.

100.    The substantial risk of harm and loss of privacy from the Data Breach has caused Cabonilas to suffer fear, anxiety, annoyance, inconvenience, and nuisance.

101.    The Data Breach caused Cabonilas to suffer a diminution in the value of her Sensitive Information.

102.    Cabonilas has a continuing interest in ensuring that her Sensitive Information, which upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

103.    As a result of the Data Breach, Cabonilas has also suffered injury directly and proximately caused by the Data Breach, including: (i) her valuable Sensitive Information was accessed by unauthorized third-parties; (ii) the imminent and certain impending injury flowing from fraud and identity theft posed by her Sensitive Information being placed in authorized hands, including of potential cyber criminals; (iii) damages to and diminution in value of her Sensitive Information that was entrusted to Defendants with the understanding that Defendants would safeguard the information against disclosure; (iv) loss of the benefit of the bargain her healthcare provider made with Defendants for her benefit by paying/overpaying for services that were intended to be accompanied by adequate data security but were not; (v) loss of time that Cabonilas

has had to expend in an attempt to ameliorate, mitigate, and address the consequences of the Data Breach, with such steps being taken at the direction of Defendants; and (vi) continued risk to her Sensitive Information, which remains in the possession of Defendants and which is subject to further breaches so long as Defendants fail to undertake appropriate and adequate measures to protect it.

## VI.    CLASS ACTION ALLEGATIONS

104.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

105.    Plaintiff brings this action on behalf of herself and all others similarly situated as a class action pursuant to Federal Rule of Civil Procedure 23.

106.    Plaintiff seeks to represent a class defined as follows, and all subject to confirmation, clarification, and/or modification based on discovery to be conducted in this action:

> All individuals whose Personally Identifying Information or Protected Health Information was exposed to an unauthorized party as a result of the Data Breach reported by Defendants to have occurred on approximately December 15, 2024 (the "Class").

107.    Excluded from the Class are: (1) Defendants and Defendants' parents, subsidiaries, affiliates, legal representatives, officers, directors, employees, assigns, successors, and any entity in which Defendants have a controlling interest; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; (3) Class Counsel; and (4) all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out.

108.    Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

19

109.    The Class may be maintained in this case under Federal Rules of Civil Procedure 23(b)(3) for the reasons that follow.

110.    **Numerosity**:  While the exact number of Class Members is unknown to Plaintiff at this time and can only be determined by appropriate discovery, membership in the Class is ascertainable based upon the records maintained by Defendants.  Even excluding residents of other states, there are at least 70,000 Class Members in Texas and South Carolina alone.  Therefore, the Class Members are so numerous that the individual joinder of all Class Members is impracticable under Federal Rule of Civil Procedure 23(a)(1).

111.    **Commonality**:  There are common questions of law that exist as to all Class Members pursuant to Federal Rule of Civil Procedure 23(a)(2) and (b)(3).  Legal and factual issues common to the Class exist and predominate over any questions affecting only individual Class Members.  These common issues include, but are not limited to:

  a.  Whether Defendants violated HIPAA's timely notification requirement, persuasive evidence of negligence state law;

  b.  Whether Defendants violated HIPAA's notification requirements by omitting required content from the Notice Letters, persuasive evidence of negligence;

  c.  When Defendants actually first learned about the Data Breach;

  d.  When Defendants actually sent the Notice Letters to the Class;

  e.  Whether and to what extent Defendant had a duty to protect the Sensitive Information of Plaintiff and Class Members;

  f.  Whether Defendants had duties not to disclose the Sensitive Information of Plaintiff and Class Members to unauthorized third parties;

  g.  Whether Defendants failed to adequately safeguard the Sensitive Information of Plaintiff and Class Members;

  h.  Whether Defendants adequately, promptly, and accurately informed Plaintiff and Class Members that their Sensitive Information had been compromised;

i.   Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

j.   Whether Defendants have adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

k.   Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendants' wrongful conduct;

l.   Whether Plaintiff and Class Members are entitled to restitution as a result of Defendants' wrongful conduct;

m.   Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach; and

n.   Whether Defendants acted negligently.

112.   **Typicality**:  Plaintiff's claims are typical of the claims of the Class Members whom she seeks to represent under Federal Rule of Civil Procedure Rule 23(a)(3) because Plaintiff and each Class Member had their Sensitive Information compromised as a result of the Data Breach due to Veradigm's misfeasance and because Class Members seek the same injunctive relief and the same or substantially similar monetary and/or nominal damages.  Plaintiff is advancing the same claims and legal theories on behalf of herself and all Class Members.

113.   **Adequacy of Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class Members as required by Federal Rule of Civil Procedure 23(a)(4).  Plaintiff is an adequate representative because her interests do not conflict with the interests of the Class Members.  Plaintiff does not have any interest which might cause her to not vigorously pursue this action.  Plaintiff anticipates no difficulty in the management of this litigation as a class action.  Therefore, the interests of the Class Members will be fairly and adequately protected.

114.   Further, Plaintiff has retained competent counsel, including counsel experienced in complex class action litigation, including consumer protection and privacy cases.  Her chosen

counsel has experience in complex litigation, including data privacy, and has the financial and legal resources to meet the costs and legal issues associated with this type of litigation.

115. **Predominance & Superiority**:  A class action is the superior method for the fair and efficient adjudication of this controversy pursuant to Federal Rule of Civil Procedure 23(b). Prosecuting separate actions on behalf of individual class members would create a risk of inconsistent adjudications, including on Defendants' compliance with federal laws central to the necessary question of tort duty in this litigation.  Furthermore, the adjudication of issues, like duty, in one individual matter will be dispositive of those issues in all individual cases.  The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct.

116. Additionally, questions of law and fact common to Class Members predominate here.  There are few difficulties in managing this case as a class action, whereas there are many difficulties associated with proceeding on an individual basis.  It would be virtually impossible for individual Class Members to effectively redress the wrongs done to them.  Even if the Class Members could afford such individual litigation, the court system could not.  Individualized litigation presents the potential for inconsistent or contradictory judgments, including on central issues of federal law.  Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

117. **Ascertainability**:  Members of the Class can be readily identified and notified based on Defendants' own records given that Veradigm itself concedes that it has already

conducted an investigation identifying the Class Member and that it has sent, or is sending, Notice Letters to impacted patients. The very information Veradigm has used to send Notice Letters will provide the information needed to provide class notice.

118. **Policies Generally Applicable to Class Members:** The Class may also be maintained in this case under Federal Rules of Civil Procedure 23(b)(2) for the reasons set forth above as well as because Veradigm has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief is appropriate respecting the Class as a whole. This requires the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

119. Unless a Class-wide injunction is issued, Defendants may continue in the failure to properly secure the Class Members' Sensitive Information. Additionally, Defendants may continue to refuse to provide proper notification to Class Members regarding the Data Breach. For instance, Veradigm may continue to keep Class Members in the dark about the specific medical and health insurance information implicated. Finally, Defendants may continue to act otherwise unlawfully as set forth herein.

## VII. CAUSES OF ACTION

### COUNT ONE
### NEGLIGENCE

120. Plaintiff and Class Members repeat and re-allege each allegation as if fully set forth herein.

121.    Plaintiff and Class Members entrusted their Sensitive Information to their healthcare providers and, through their healthcare providers, to Defendants, on the premise and with the understanding that Defendants would safeguard their information, use their information for business purposes only, and/or not disclose their Sensitive Information to unauthorized third parties.

122.    Defendants had full knowledge of the sensitivity of the PII and PHI and the types of harm that Plaintiff and Class Members could and would suffer if the Sensitive Information were wrongfully disclosed.

123.    Defendants knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of Plaintiff's and Class Members' Sensitive Information involved an unreasonable risk of harm to Plaintiff and Class Members, including if the harm occurred through the acts of a third party.

124.    By accepting, storing, and maintaining Plaintiff's and Class Members' Sensitive Information, and by touting its own compliance with the law on its website and through BAA contracts with healthcare providers, Veradigm undertook a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.  This duty includes, among other things, designing, maintaining, and testing Defendants' security protocols to ensure that the Sensitive Information of Plaintiff and the Class Members in Defendants' possession was adequately secured and protected.

125.    By accepting, storing, and maintaining Plaintiff's and Class Members' Sensitive Information, Defendants also had a duty to have procedures in place to detect and prevent the improper access and misuse of the Sensitive Information of Plaintiff and Class Members.

126. Additionally, Defendants had a duty to safeguard the Sensitive Information through reasonable and appropriate data security methods, as evidenced by Section 5 of the FTC Act. The FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses of failing to use reasonable measures to protect PII. The FTC pursuant to that Act has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.[15] Veradigm violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein.

127. Veradigm's noncompliance with these standards is essential to determining Veradigm's duty, a necessary element of the state law negligence claim. Furthermore, determining Veradigm's failure to comply with the FTC Act harmonizes the balance of responsibilities in between federal and state courts by encouraging compliance with federal law.

128. Defendants also had a duty to safeguard the Sensitive Information through reasonable and appropriate data security methods, as well as to provide timely and detailed disclosures to patients pursuant to HIPAA.[16] HIPAA requires, among other things, that a business associate like Veradigm "must comply with the applicable standards, implementation specifications, and requirements of this subpart with respect to electronic protected health information[.]" 45 C.F.R. § 164.302.[17]

---

[15] *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

[16] Defendant is a BAA for covered entity. As such, it is required to comply with administrative safeguards, 45 CFR § 164.308, and agree to do so through specific written requirements or other approved means.

[17] *See also*, 45 C.F.R. § 160.103.

129.     HIPAA's Security Rule requires Defendants to:  (i) ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits; (ii) protect against any reasonably anticipated threats or hazards to the security or integrity of such information; (iii) protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and (iv) ensure compliance by its workforce.

130.     HIPAA also requires Veradigm to review and modify the security measures it implements to make sure Veradigm continues to provide "reasonable and appropriate protection" of the information.  45 C.F.R. § 164.306(c).  HIPAA also requires implementation of technical policies and procedures so that only authorized persons and programs have access to those data. 45 C.F.R. § 164.312(a)(1).

131.     The Data Breach at Veradigm establishes that it did not comply with these policies and procedures.

132.     Additionally, Defendants were subject to an "independent duty," untethered to any contract between Defendants and Plaintiff or the Class because Defendants serve as an authorized business associate.

133.     A breach of security, unauthorized access, and resulting injury to Plaintiff and Class Members was reasonably foreseeable, due to the nature of Defendants' industry in the healthcare field, and particularly in light of Defendants' inadequate security practices and known data breach trends.

134.     Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices and procedures.  Defendants knew or should have known of the inherent risks in collecting and storing the Sensitive Information of Plaintiff and Class Members,

the critical importance of providing adequate security of that Sensitive Information, and the necessity for encrypting Sensitive Information stored on Defendants' systems.

135.    Defendants' own conduct created a foreseeable risk of harm to Plaintiff and Class Members.  Defendants' misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach as set forth herein.  Upon information and belief, Defendants' misconduct also included its choice not to comply with industry standards for the safekeeping of the Sensitive Information of Plaintiff and Class Members, including basic encryption techniques available to Defendants.

136.    Defendants knew or should have known that Plaintiff's and Class Members' Sensitive Information was stored on their storage systems and were or should have been aware of the extreme risks associated with failing to properly safeguard Plaintiff's and Class Members' Sensitive Information.

137.    Plaintiff and Class Members had no ability to protect their Sensitive Information that was in, and remains in, Defendants' possession.

138.    Veradigm was and is in the best position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

139.    Defendants have and continue to have a duty to adequately disclose that Plaintiff's and Class Members' Sensitive Information within Defendants' possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when.  Such notice was and is necessary to allow Plaintiff and Class Members to take steps to prevent, mitigate, and remediate the exposure of their Sensitive Information to unauthorized third parties.

140. Defendants had a duty to employ proper procedures to prevent the unauthorized dissemination of the Sensitive Information of Plaintiff and Class Members.

141. Defendants improperly and inadequately safeguarded the Sensitive Information of Plaintiff and Class Members in violation of standard industry rules, regulations, and practices at the time of the Data Breach.

142. Defendants, through their actions and/or omissions, unlawfully breached their duties to Plaintiff and the Class Members by failing to implement industry protocols and exercise reasonable care in protecting and safeguarding the Plaintiff's and Class Members' Sensitive Information during the time the Sensitive Information was within Defendants' possession or control.

143. Defendants failed to heed industry warnings and alerts to provide adequate safeguards to protect the Sensitive Information of Plaintiff and Class Members in the face of increased risk of theft.

144. Defendants, through their actions and/or omissions, unlawfully breached their duty to Plaintiff and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of Sensitive Information.

145. Defendants, through their actions and/or omissions, unlawfully breached their duty to adequately and, in a timely manner, disclose to Plaintiff and Class Members the existence and scope of the Data Breach.

146. But for Defendants' wrongful and negligent breach of duties owed to Plaintiff and Class Members, the Sensitive Information of Plaintiff and Class Members would not have been compromised.

147. Plaintiff and Class Members suffered an injury when their Sensitive Information was accessed by unknown third parties.

148. There is a close causal connection between Defendants' failure to implement security measures to protect the compromised Sensitive Information and the harm and increased risk of imminent harm suffered by Plaintiff and Class Members.

149. The Sensitive Information of Plaintiff and Class Members was lost and accessed as the proximate result of Defendants' failure to exercise reasonable care in safeguarding such Sensitive Information by adopting, implementing, and maintaining appropriate security measures.

150. As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) imminent risk of identity theft; (ii) the loss of the opportunity of how their Sensitive Information is used; (iii) the compromise, publication, and/or theft of their Sensitive Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Sensitive Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the present and continuing consequences of the Data Breach, including but not limited to, efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports and/or obtaining new driver's licenses; (vii) the continued risk to their Sensitive Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Sensitive Information of Plaintiff and Class Members; (viii) diminution of their Sensitive Information's value, and (ix) present and continuing costs in terms of time, effort, and money that has been and will be expended to prevent, detect, contest, and repair the impact of

the Sensitive Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

151.    As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

152.    As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members are entitled to recover actual, consequential, nominal, and injunctive relief.

**COUNT TWO**
**BREACH OF IMPLIED CONTRACT**
**(DIRECTLY AND AS A THIRD-PARTY BENEFICIARY)**

153.    Plaintiff and Class Members repeat and re-allege each allegation in the Complaint as if fully set forth herein.

154.    At all relevant times, Veradigm implemented a written Privacy Policy and HIPAA Notice whereby it expressly promised the public, including its customers and Plaintiff and Class Members, that it would only disclose PII and/or PHI under certain circumstances. The Data Breach was not a qualifying circumstance.

155.    Plaintiff and Class Members entrusted their Sensitive Information to healthcare providers, who in turn all contracted with Defendants. In so doing, the healthcare providers entered into implied contracts with Defendants by which Defendants agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen. Plaintiff and Class Members were third party beneficiaries of these contracts.

156.    When Veradigm obtained Plaintiff's and the Class's Sensitive Information from healthcare providers, both Veradigm and the healthcare providers had a shared agreement and

understanding that Veradigm would protect Plaintiff and Class Members' Sensitive Information and avoid taking unreasonable risks in its storage for the benefit of Plaintiff and Class Members.

157.     Certain obligations imposed on Veradigm were implicit in this agreement, including that Veradigm would: (i) only use the Sensitive Information business purposes; (ii) implement reasonable measures to protect that Sensitive Information; (iii) prevent unauthorized disclosure of the Sensitive Information; (iv) give Plaintiff and Class Members timely and adequate notice of any unauthorized access to their Sensitive Information; (v) maintain reasonable security measures to protect Plaintiff's and Class Members' Sensitive Information from unauthorized disclosure or use; and (vi) store the Sensitive Information only under conditions that ensured its security and confidentiality.

158.     The healthcare providers would not have provided Plaintiff and Class Members' Sensitive Information to Defendants if they had known that Defendants would make the Sensitive Information accessible via the internet, fail to encrypt sensitive data elements, and/or fail to delete the Sensitive Information when Defendants no longer had a legitimate business need to retain it.

159.     The healthcare providers fully performed their obligations under the implied contracts with Veradigm.

160.     Yet, Veradigm breached the implied contracts they made with the healthcare providers for Class Members' benefit by, *inter alia*, failing to safeguard and protect Plaintiff and Class Members' Sensitive Information, failing to delete the information of Plaintiff and the Class once the relationship ended, and failing to provide timely and accurate notice to Plaintiff and Class Members that the Sensitive Information was compromised as a result of the Data Breach.

161.    Plaintiff's and Class Members' losses and damages, as described herein, were the direct and proximate result of Defendants' breach of the implied contract with their healthcare providers.

## COUNT THREE
## BREACH OF IMPLIED COVENANT OF GOOD FAITH
## AND FAIR DEALING AS A THIRD-PARTY BENEFICIARY

162.    Plaintiff and Class Members repeat and re-allege each allegation in the Complaint as if fully set forth herein.

163.    Contracts have an implied covenant of good faith and fair dealing.

164.    This implied covenant is an independent duty.

165.    A party can breach the implied covenant even if there is no breach of a contract's express terms.

166.    Here, upon information and belief, all impacted healthcare providers, including Virginia Ear, Nose & Throat Associates, complied with and performed all conditions of their contractual agreements with Veradigm.

167.    These contractual agreements were for the express benefit of the impacted healthcare provider's patients, including Plaintiff and Class Members.

168.    Veradigm violated the implied covenant of good faith and fair dealing through: (i) inadequate computer systems and insufficient data security measures to protect Sensitive Information; (ii) delayed and inaccurate disclosure of the Data Breach to the Plaintiff and Class Members; and (iii) continuing to collect and store Sensitive Information and other personal data after Defendants knew, or reasonably should have known, about the security vulnerabilities that were exploited in the Data Breach.

169.    Veradigm acted maliciously and/or in bad faith by denying Plaintiff and Class Members, as third party beneficiaries, the full benefit of their bargains as originally intended by the parties (Veradigm and the health care providers of Class Members), thereby causing them injury in an amount to be determined at trial.

**COUNT FOUR**
**UNJUST ENRICHMENT**

170.    Plaintiff and Class Members repeat and re-allege each allegation in the Complaint as if fully set forth herein.

171.    By providing their Sensitive Information to Veradigm through their healthcare providers, Plaintiff and Class Members conferred a monetary benefit on Veradigm.  Veradigm would not be able to engage in its regular course of business without that Sensitive Information.

172.    Defendants accepted that monetary benefit.

173.    It would be inequitable for Veradigm to retain that benefit under the facts and circumstances in this case.

174.    Veradigm enriched itself by saving the costs it reasonably should have spent on data security measures to secure Plaintiff's and Class Members' Sensitive Information.

175.    Instead of providing a reasonable level of security, Veradigm chose to use the money to increase its own profits by cutting corners and implementing cheaper, ineffective security measures.

176.    This choice resulted in direct and proximate loss to Plaintiff and the Class Members when their data was breached.

177.    Veradigm has been unjustly enriched through its failure to properly protect the sensitive personal and medical information provided to it by Plaintiff and Class Members.  While Veradigm derived revenue and business value from collecting and utilizing this data, it improperly

transferred the risks and costs of the resulting data breach—including identity theft exposure, credit monitoring expenses, and privacy violations—to Plaintiff and the Class.

178.   It is inequitable and unjust for Veradigm to retain these benefits without appropriately compensating Plaintiff and Class Members, particularly given Defendants' failure to implement reasonable data security and management safeguards.

179.   Had Plaintiffs and Class Members known that Defendants failed to adequately secure their Sensitive Information, they would not have consented to Defendants having access to their Sensitive Information.

180.   Plaintiff and Class Members lack an adequate remedy at law.

181.   As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will continue to suffer additional forms of injury and harms, including, but not limited to, loss of control over how their Sensitive Information is used; compromise, publication, and theft of their Sensitive Information; out-of-pocket expenses related to preventing, detecting, and recovering from identity theft and unauthorized use of their Sensitive Information; lost time and productivity spent addressing and attempting to mitigate the actual and potential consequences of the Data Breach, including time spent researching identity theft prevention, detection, and recovery; ongoing risk to their Sensitive Information, which remains in Defendants' possession and vulnerable to further unauthorized disclosure absent adequate protective measures; and future expenditures of time, effort, and money required to prevent, detect, contest, and remedy the impact of the compromised Sensitive Information for the remainder of Plaintiffs' and Class Members' lives.

182.   Defendants should be required to disgorge all proceeds unjustly received into a common fund or constructive trust for the benefit of Plaintiff and Class Members.

## VIII.   PRAYER FOR RELIEF

Wherefore, Plaintiff, on behalf of herself and all others similarly situated, prays for judgment against Defendants as follows:

A.      An order certifying the proposed Class, designating Plaintiff as a named representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

B.      Equitable and injunctive relief enjoining Veradigm from engaging in the wrongful conduct complained of herein and requiring Veradigm to affirmatively protect data through best practices such as encryption, deleting and purging Sensitive Information that is no longer needed; enhanced auditing, testing, and training for personnel regarding new security procedures; and all other therapeutic reforms necessary;

C.      Money damages, in the form of actual, nominal, and consequential damages in an amount to be determined by a jury at trial;

D.      Reasonable attorneys' and experts' fees and costs;

E.      Pre-judgment and post-judgment interest, as provided by law; and

F.      Such other and further relief as this Court deems just and proper.

### JURY TRIAL DEMAND

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, on all claims so triable.

Dated: October 13, 2025     Respectfully submitted,

**KIRBY McINERNEY LLP**
*/s/ Anthony F. Fata*
Anthony F. Fata
Cormac H. Broeg
211 West Wacker Drive, Suite 550
Chicago, IL 60606
Tel.: (312) 767-5180
afata@kmllp.com
cbroeg@kmllp.com

**BRAGAR EAGEL & SQUIRE, P.C.**
Melissa A. Fortunato (*pro hac vice forthcoming*)
Casey C. DeReus (*pro hac vice forthcoming*)
810 Seventh Avenue, Suite 620
New York, NY 10019
Tel: (212) 308-5858
Fax: (212) 486-0462
fortunato@bespc.com
dereus@bespc.com

*Counsel for Plaintiff and Putative Class*